Good morning, my name is Thomas Patterson. I'm here to celebrate the Attorney General's office and to represent the seated officials in this case. I'd like to reserve two minutes for rebuttal. The officials here are entitled to qualified immunity because a reasonable official could have believed that the notice the Mr. Cook received satisfied the minimal constitutional requirements for gaining validation proceedings in prisons. Under due process laws, they may turn to some notice of the charges and an opportunity to make their views known concerning validation. Here, the officials could have believed that Mr. Cook received both of those things. First, they could have thought that because there is no dispute that there was not a notice for one of the items that he was validated under and because only one item is needed under constitutional standards that any error or any lack of notice concerning other items was nothing more than harmless error. Second, even the confidential items that were used as evidence Mr. Cook received some notice of, they were confidential because they were in gang communications and posed security dangers if they were fully disposed to Mr. Cook. The prison gave Mr. Cook as much notice as it could without compromising safety and security, without potentially putting other inmates at risk of assault or even murder given the dangerous nature of the Aryan Brotherhood and its well-documented dangers as this court has recognized previously. Mr. Cook did not express any questions about or did not say that he was unable to understand what was at issue in this case, what was clear from the notices as a whole is that Mr. Cook's gang validation was an issue. Absolutely, and it appears that the district judge said, you know, this wasn't inadequate because of the change, the 2010 change in the law. Do you want to address that? Sure. The district court said that in the change that inmates who were placed in the Security and Housing Act, which is often a result of being validated as a gang member, would no longer be earning credit on their sentence. Now, this particular change, of course, was not in effect in 2008 when Mr. Cook was validated, but since the officials who validated him would have been able to anticipate that this was something that but his hearing was often on assault at the end of 2008. But when you look at the Woolf language, you have the officers can't be expected to be impressioned that the legislature might adopt certain language. Woolf says it's difficult for purposes of procedural due process to distinguish between procedures that are required where there's that blurred line. Doesn't that get them to notice that it's always not necessary to put something in a precise box, but that the both procedures are illogical? There are several ways I think of it. I'm concerned that if you're on a personal thing about deliveries, credits are no bearing on Mr. Cook in this case. We understand because he's still his sentence. Yes, he's a life sentence. He's never going to get out. He's never going to get out. So, it's somewhat curious that the District Court wasn't asking about them or requiring about them to begin with. But aside from that, if we look at the Supreme Court's case that has addressed how much process is to be afforded to inmates who are placed in supermax confinement, in this kind of case, Wilkinson v. Wilson, it was primarily that inmates were being placed in security and supermax confinement because of gang allegations. The Supreme Court looked at the various impacts that existed for an inmate who was placed in supermax confinement. The conditions there, the, in that case, the extreme isolation that the inmate could face. It also looked at whether the inmate could be, it looked at any effects on the inmate's sentences, because there's no parole sentence. And what I said is that there in Ohio, an inmate who was placed in supermax confinement would be ineligible for receiving parole at all, even if he was otherwise ineligible. So, that's, in our view, an even more extreme condition of confinement than just having a reduced ability to earn a sentence credit. And we're going to try and compare this to the Wolf v. McDonald situation, where if Wolf there was a sentence credit for future innovation, the inmate had already earned a credit. And the issue is whether he was going to have to give up that credit because of a parole violation in the past. It was a backward-looking retrospective fact determination, as opposed to, in this case, a forward-looking predictive security judgment. When California understands that it is subject to the Wolf standard, what additional steps does it take? Of course, the difference between a Wolf hearing and a Huet hearing. Under Huet, as the Supreme Court has said, it has adopted that Huet standard, and Wolf v. Sauce has only provided some notice of the charges at issue and an opportunity to be, for the inmate to be excused. Now, under Wolf, there are more robust procedures that are allowed. An inmate has a qualified right to call witnesses. And it's a right to call witnesses because they're looking at, they're looking backwards at whether something happened in the past. Did a assault take place? Did the inmate have a weapon with him? Those types of questions, witnesses are helpful in the process. As a matter of fact, we're looking at fact determination. In this type of case, officials are trying to look forward. They're asking, what is the risk that this inmate poses to the safety and security of the institution? And it's still a backwards question. It's in the past, as he had. There's some kind of inquiry there that relates to some kind of contact. He's affiliated. He's a gay. He's exchanged. So, as it is, he sends an inclusive message. He's doing something. That's absolutely right. There is a backwards element to it, you know, of fact determination. But it is, even that determination, it has to be, officials receive a lot of discretion in making that determination because it's not just a pure question of, in this hypothetical inmate, there's a lot of nuance that goes into the understanding of what's going on with a gay, quite a distant gay, that is set on evading detection and still being able to undertake very dangerous activities, consulting guards, consulting other inmates, even attacking people, for instance, outside of prison. So, we have things like coded messages that get intercepted. In this particular case, there were two letters that were coded. One was decoded by the FBI, and the FBI determined that there was actually gay communications going on here. They were talking about things that were under seal. In this case, it's been identified by communicating to the inmate for reasons, but we can look at the records and see that there were dangerous activities that were being communicated. The other piece of evidence is the FBI, which is now themselves more familiar with what's going on in prison, the specific means that gays use to communicate, and the particular dangers that are at stake. So, with that, I have reached my time for reserving a little bit of time for other questions. I'll turn it over to the inmate. Thank you. Good morning, Your Honors. May it please the Court, William McKenna, on behalf of the Plaintiff Appellee, Mr. Scott Crook. Your Honors, the key issue here is whether the information that Mr. Crook received prior to his initial validation included sufficient information to inform him of the nature of the charges against him and afford him meaningful notice such that he could prepare a defense of the charges against him. This right to meaningful notice is clearly established and has been established since Mr. Scott. And here, the information that Mr. Crook received did not meet this requirement. He only received information that was too vague for him to prepare a meaningful defense. For example, the June 18, 2008, source item that Mr. Crook received was first given to him three months after the date that the letter was actually intercepted. This could have diminished Mr. Crook's ability to prepare a meaningful defense to the source item. Well, even if I look at the case language that you cite that is probably most favorable coming out of the second circuit, you basically need specific allegations of conduct so you know what's on the table. So even if I take that most generous language, he got that type of notice to me. No, Your Honor. In fact, I actually think that the most affable case is race versus formal, which is from the Northern District in California, and in that case, Plaintiff received the CDCR type 30 very similar to the ones that Mr. Crook received, and the court found that this did not meet the notice requirements. The source item, the notice he received in that case, all that it said was the letter was received and was determined to be coded and contained information showing that the plaintiff was continuing to function as a gang member. It did not specify the actual nature of the specific activity that the plaintiff was taking part in, and the court found that because of this, it did not provide him with sufficient notice. They gave him the incidence, and he had four pages of rebuttal to this. I mean, if you would stand there and have some notice, he had more than some notice, and he had the ability to, his response suggested he had sufficient notice, doesn't it? Well, I think simply because you prepare a rebuttal should not prejudice him from still contesting the specificity of the information that he received. He repeatedly said in his rebuttal that the information that he received was too vague to respond to. I have something to add. With that, I'm going to go quite a few of these different kinds of cases in the prison environment. I want to ask whether or not this really is different in nature to indicate whether or not some of our prior cases are material to our decision. Now, you have in mind Judge Trotz, the vision that he wrote on behalf of the court in Bruce. Judge Trotz was very direct there. This kind of a decision, where you're going to house people, is an administrative decision. That is, he says that the prison is essentially a matter of administrative discretion, and it's the word discretion. And where we have other cases which are covered, are these cases dealing with where a prisoner is going to be housed of less consequence to us? Because, as we have earlier said, it's essentially a matter of administrative discretion. I don't think so, Your Honor, because I think that the standard still applies even for administrative discretion. Prisoners are all a certain amount of process, so the issue is still whether the plaintiff was going to warrant an acquittal. Were you able to get that language in Bruce? I didn't hear that exception in Bruce. Maybe I missed something. I think the language is very clear in Judge Trotz's draft. Well, let's say on Bruce, because Bruce was the one who was talking about where you're going to put the prisoner. And we said there in Bruce that it's essentially a matter of administrative discretion. Discretion, we understand what it is. There's much more latitude, and so I'm trying to focus your argument in reference to Bruce. Well, even as Bruce has been subsequently implied in the administrative segregation context, as it did in Ray's, the court found that even under those standards, notice, the notice provided was not meaningful. Some notice, as you knew. Correct, some notice, but the notice, even though it doesn't have to be specific to each source, there must be some notice such that it is meaningful for the defendant. The purpose of providing notice is so that the prisoner may have a meaningful opportunity to present his views and challenge the notice that was provided. I want to shift back the discussion to clothes, and what I think is the key issue here, and that is the qualified immunity determination. It seems to me that what I think you need to convince is what the cologne is clearly established, and you mentioned consent. Consent actually says that the wolf applies only on the state for disciplinary reasons. It's for throwing sentence credits, which we don't have here. How is it these officers would have known that, quote, what's bad in the cologne is clearly established on a miscircumstance? Now, I don't think that the officials needed to understand the wolf was applicable. I think even under the Wilkinson standard, which the district court applied even after its discussion regarding which was the proper standard in light of the 2010 change in law. Wait a minute, but the delegation took place in 2008. Correct. So how are the officers supposed to anticipate cases that are going to come seven years later? Right, my point is I don't think that that's actually the stereotype that they needed to rethink, even under the Wilkinson standard. The officials shouldn't have understood that there was a right to receive meaningful notice. And then we're going to have both those cases. If you're the Wilkinson, because they don't have Wilkinson, how can they, how can we hold them responsible for cases that these officers never had to know that the notice that they were giving your client wasn't adequate? Too slow on establishment. What, what in Tucson? What language in Tucson are you referring to? We don't have the specific language in front of me, but... What phrase, what phrase? Um, it's a principle that establishes deliberate interest. Right, but, but, but the great word in you is that that would be some evidence. But I understand Tucson deviated from that. Correct, but this is as to the self-notice requirement. Okay, so what, what notice, what notice is inadequate here? What, what, what, what should anybody in or out of Tucson pursue it that would advise these officers that they were violating the Constitution when they gave it the summary of the evidence they had? And is there a doubt that they were giving you enough evidence? Even if you look at the prison regulations, those required then as part of the process that the inmate receives prior to the violation, um, is required to receive notice of the charges. Right, and they gave him, they gave him things and he responded to it as Judge McEwen has, has asked judges. He, he had very detailed handwritten responses to each piece of evidence that's clear that he had notice of the evidence against him. But some of his responses were that the information that he received... At least, at least one. He complained that it was, that it was too vague. Just because a prisoner says it's too vague, doesn't mean that it's, that it's too vague. And again, the difference between Hewitt and Wolf is quite significant. Correct, Your Honor, but even I have raised the, the inmate had also prepared a rebuttal and that was not found to, to penalize him. So the officer should have known to raise, even though it's in a Ninth Circuit or a Supreme Court case? Um... And if he should hold a third constitutional liability that created a procedure of the Northern District of California, would he have been invalidated? No, Your Honor, a raise occurred in 2012 and not in 2008. So he would have known to raise. So it has to be either Tucson, something that was in Tucson, or Hewitt, or something else like that. Correct, Your Honor, I think that does make clear two procedures that are required. I see that I am out of time. Thank you. Thank you. Just briefly, the case law on qualified inmates has made very clear that the notice that the officiants have to be under has to be pretty detailed, pretty, pretty close. And in 2008, when these officials acted, there was no case on point that showed that the notice in this case was inadequate. In fact, the case that would have been on point, Tucson, specifically says that the due process does not require, quote, detailed written notice of the charges. Is there anything after 2008 that would suggest that the officer's notice was supposed to be under? I understand you're saying qualified inmate, I understand the argument. I'm trying to figure out is, what's required today? Is the notice that gave you, is the notice under today's standards, is the notice that gave you in 2008 inadequate? No, Your Honor, it's still under current case law. There's nothing from this court or from even other circuits that would say that the particular notice here was inadequate. Now, even if we're going to look at the changes today, and we're going to look at what an inmate is subject to if he's placed in, I'm sorry, if he's validated. Today, as plaintiff has noticed, inmates who are validated as gang members are not necessarily put in the SHU any longer. They're not placed in the SHU just because they are gang members. They're placed in the SHU because of behavior. If they've done something wrong, then they can be placed in the SHU. So, to the extent that we're going to look at, plaintiff's beginning to note that you'd be under both, right? Right. So, to the extent that we're going to look at today, there's no basis to define that, or a process would have been required. I see that I'm just about out of time. If there are further questions, I'd be happy to answer them. Thank you. Thank you, Your Honor. I'd like to thank both counsel for your argument this morning, especially Ms. McKenna, who is participating in the approval program, which is very helpful for the court. And I'm sure Mr. Cash agrees it's always easier to respond to a counsel's argument. And the court prepares to thank both of you for your participation this morning. The case of Cook v. Cade is submitted.
judges: Wallace, McKeown, Bybee